SMITH PATTEN
DOW W. PATTEN, ESQ. (SBN: 135931)
888 S. Figueroa Street, Suite 2030
Los Angeles, CA 90017
Telephone (415) 402-0084; (213) 488-1300
Facsimile (415) 520-0104
Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| W. PAUL SIMMONS, an individual, | ) Case No.: |
| | ) |
| | ) **COMPLAINT FOR DAMAGES AND** |
| Plaintiff, | ) **INJUNCTIVE RELIEF** |
| | ) |
| v. | ) **1) Retaliation in Violation of the Consumer** |
| | ) **Financial Protection Act of 2010 (12 U.S.C.** |
| | ) **§ 5567, *et seq.*)** |
| | ) |
| DON HANKEY, an individual; HANKEY | ) **2) Wrongful Termination in Violation of** |
| GROUP, an unincorporated association; | ) **Public Policy** |
| HANKEY INVESTMENT COMPANY, | ) |
| LP, a California Limited Partnership, | ) **3) Breach of Contract** |
| individually and as member of HANKEY | ) |
| GROUP; WESTLAKE SERVICES, LLC, | ) **4) Breach of the Implied Covenant of Good** |
| d/b/a WESTLAKE FINANCIAL | ) **Faith and Fair Dealing** |
| SERVICES, LLC, a California Limited | ) |
| Liability Company, individually and as | ) **5) Violation of Cal. Lab. Code §§ 970, 972** |
| member of HANKEY GROUP; and DOES | ) |
| 1-50, inclusive. | ) **6) Violation of Cal. Lab. Code § 203** |
| | ) |
| | ) **7) Violation of Cal. Lab. Code § 221** |
| Defendants. | ) |
| | ) **8) Whistleblower Retaliation (Cal. Lab. Code** |
| | ) **§ 1102.5)** |
| | ) |
| | ) **9) Unfair Business Practices (Cal. Bus. & Prof.** |
| | ) **Code § 17200, *et seq.*)** |
| | ) |
| | ) **10) False Light** |
| | ) |
| | ) **11) Promissory Fraud** |
| | ) |
| | ) **12) Fraud by Intentional Misrepresentation** |
| | ) |
| | ) **JURY TRIAL DEMANDED** |

1

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff W. PAUL SIMMONS ("Plaintiff" or "SIMMONS") files this Complaint for Damages and Injunctive Relief, and complains of the named Defendants, and each of them, jointly and severally, and for claims, alleges as follows:

## GENERAL ALLEGATIONS

1.      At all times herein mentioned, Plaintiff was and continues to be an individual residing within this judicial district.

2.      At all times herein mentioned, Defendant DON HANKEY (hereinafter "HANKEY") is an individual residing within this judicial district.

3.      At all times herein mentioned, Defendant HANKEY GROUP (hereinafter "HANKEY GROUP") is an unincorporated association of entities (including Defendants HANKEY INVESTMENT COMPANY, LP; WESTLAKE SERVICES, LLC, d/b/a WESTLAKE FINANCIAL SERVICES, LLC; NOWCOM CORPORATION; MIDWAY RENT A CAR, INC. ("MIDWAY"); HFC ACCEPTANCE, LLC; and both KNIGHT NATIONAL INSURANCE COMPANY and KNIGHT INSURANCE GROUP (collectively, "KNIGHT") doing business within this judicial district, with its principal place of business located at 4751 Wilshire Boulevard, Suite 100, Los Angeles, CA 90010.

4.      At all times herein mentioned, Defendant HANKEY INVESTMENT COMPANY, LP (hereinafter "HIC") is a California Limited Partnership, licensed to and doing business within this judicial district, with its principal place of business located at 4751 Wilshire Boulevard, Suite 100, Los Angeles, CA 90010, and is a member of the unincorporated association HANKEY GROUP.

5.      At all times herein mentioned, Defendant WESTLAKE SERVICES, LLC, d/b/a WESTLAKE FINANCIAL SERVICES, LLC (hereinafter "WESTLAKE") is a California Limited Liability Company, licensed to and doing business within this judicial district, with its

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

principal place of business located at 4751 Wilshire Boulevard, Suite 100, Los Angeles, CA 90010, and is a member of the unincorporated association HANKEY GROUP.

6.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claim for Retaliation in violation of the Consumer Financial Protection Act of 2010 (12 U.S.C. § 5567, *et seq*.) ("CFPA") arises under federal law.  This Court has supplemental jurisdiction over all of Plaintiff's other state law claims under 28 U.S.C. § 1367(a) because each of them arise from the same common nucleus of operative facts.

7.    Venue is proper in this Court as the acts complained of occurred within this judicial district, and each named defendant does business within this judicial district.

8.    Plaintiff has been damaged far in excess of the jurisdictional amount of this Court.

## INTRODUCTION

9.    This is an action for damages and injunctive relief for Retaliation in violation of the CFPA, Wrongful Termination in violation of Public Policy, violations of the California Labor Code, Unfair Practices in violation of the Business and Professions Code, and False Light.  This action arises out of events involving SIMMONS and his employment with HANKEY and the HANKEY GROUP, and the other Defendants named herein (collectively hereinafter, "Defendants").

## THE PARTIES

10.    Plaintiff SIMMONS is a highly-experienced financial executive with nearly three decades of top-tier experience and a long track record of successful business development and management, and served as the President and Chief Operating Officer ("COO") of the HANKEY GROUP from approximately June 2014 to October 1, 2015, when he was summarily terminated.

11.    Defendant HANKEY is an individual residing within this judicial district, and has acted as Agent and Owner of the constituent entities of the HANKEY GROUP.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

12.    Defendant HANKEY GROUP is an unincorporated association of entities, including Defendants HIC and WESTLAKE, doing business within this judicial district, with its principal place of business located at 4751 Wilshire Boulevard, Suite 100, Los Angeles, CA 90010.

13.    Defendant HIC is a California Limited Partnership, licensed to and doing business within this judicial district, with its principal place of business located at 4751 Wilshire Boulevard, Suite 100, Los Angeles, CA 90010, and is a member of the unincorporated association HANKEY GROUP.

14.    Defendant WESTLAKE is a California Limited Liability Company, licensed to and doing business within this judicial district, with its principal place of business located at 4751 Wilshire Boulevard, Suite 100, Los Angeles, CA 90010, and is a member of the unincorporated association HANKEY GROUP.

15.    At all times herein mentioned each of the Defendants was the agent and employee of each of the remaining defendants, and in doing the things hereinafter alleged, was acting within the scope of such agency.

16.    Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1-50, inclusive, and Plaintiff therefore sues such defendants by such fictitious names.  Plaintiff will amend this complaint to allege their true names and capacities when ascertained.  Plaintiff is informed and believes and thereon alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences, acts, and omissions alleged herein and that Plaintiff's injuries as alleged herein were proximately caused by such aforementioned defendants.

## FACTS COMMON TO ALL CLAIMS

### SIMMONS is Recruited to the HANKEY GROUP for His Deep Executive-Level Management Experience and Professionalism.

17.    Plaintiff SIMMONS was recruited from his home in Salt Lake City, Utah, by HANKEY.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

18.     At the time HANKEY began recruiting him, SIMMONS was serving as Executive Vice President and Chief Credit Administrator at Zions Bancorporation, earning about two hundred forty thousand dollars ($240,000) annually in base salary, with an approximately 33% annual bonus.  In total, SIMMONS had approximately 27 years working in complex corporate credit and lending prior to joining the HANKEY GROUP, including experience at prestigious, "blue-chip" companies like General Electric and Citibank.

19.     SIMMONS was introduced to HANKEY in September 2013 by a colleague at Zions Bancorporation.  Over a span of approximately eight months, from September 2013 through May 2014, HANKEY and SIMMONS had numerous discussions, both in-person in Los Angeles and telephonically, concerning SIMMONS coming aboard—either as a consultant or as a partner—to take over for HANKEY and relieve his day-to-day leadership of the HANKEY GROUP.

20.     At his own expense, SIMMONS travelled to Los Angeles from his home in Salt Lake City to meet with HANKEY and other executives of the HANKEY GROUP and its constituent members on at least four occasions.

21.     As a result of those discussions, SIMMONS and HANKEY agreed that SIMMONS would endeavor to assist each of the HANKEY GROUP companies to grow, using his leadership, guidance, inspiration, and new ideas.  Part of the value that HANKEY sought, and SIMMONS' experience and expertise provided, was to generally "raise the bar" of corporate culture and implement a more "institutional" level of professionalism into each of the HANKEY GROUP companies.

22.     HANKEY specifically sought out SIMMONS for his deep professional network in the world of banking and finance, especially contacts with East Coast finance and banking professionals and organizations, and throughout the discussions, HANKEY expressed an interest in leveraging SIMMONS' network and contacts for growth opportunities for the HANKEY

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

companies. As a result, HANKEY and SIMMONS agreed upon a job title of Chief Investment Officer ("CIO"), reporting directly to HANKEY, founder and CEO.

23.    HANKEY's and SIMMONS' negotiations led to the negotiation of a term sheet for future employment. The term sheet included several elements: signing bonus, base salary, Employee Stock Ownership Plan ("ESOP") benefits, and bonus pay. As part of those discussions, SIMMONS made it clear that the compensation package would need to include a sizable signing bonus, which the parties set at five hundred thousand dollars ($500,000), to recognize the substantial differential in cost of living between Salt Lake City and Los Angeles, and to recognize the loss of equity that SIMMONS had built up over the years with Zions Bancorporation. HANKEY and SIMMONS agreed that the signing bonus amount was deemed to be "market" based on comparables with other C-level executive recruitment in financial services.

24.    HANKEY and SIMMONS negotiated the signing bonus with a repayment provision should SIMMONS terminate the relationship before completing three years of service with Defendants.

25.    As part of the negotiation, SIMMONS expressed concern about what would happen if HANKEY desired to terminate the relationship at some point prior to the expiration of the three-year repayment period. HANKEY responded, "don't worry about it – I wouldn't be hiring you if I thought there was a risk that you wouldn't do a great job for us," or words to that effect.

26.    Based upon these conversations, and e-mail correspondence, SIMMONS and HANKEY understood that SIMMONS' employment would terminate only for cause, such as poor performance.

///

///

6

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

27.    HANKEY encouraged SIMMONS to think of the signing bonus as an investment line of credit, to invest in the various HANKEY GROUP companies and potential deals that would occur in the future, which SIMMONS ultimately did.

28.    In addition to base salary, the offer letter included a Pay Plan (the "Pay Plan"), which SIMMONS and HANKEY both signed.  The Pay Plan provided incentive for SIMMONS to grow profits steadily in each of the seven HANKEY GROUP companies.

29.    The Pay Plan provided that SIMMONS would be paid a monthly bonus based on a percent of the positive increase of each company's profits year over year.  The Pay Plan clearly describes the positive increase in profits: the delta is the amount that profit is above the last year's profit in each of the constituent companies.  HANKEY and SIMMONS confirmed this understanding in e-mails leading up to the final plan, that year-over-year growth would not be offset by any negative year-over-year growth.

30.    During the negotiation period, HANKEY shared with SIMMONS the various HANKEY GROUP company financials, and did so on a monthly basis

31.    HANKEY assured SIMMONS that the health and profitability of each of the HANKEY GROUP companies justified a bonus-based "pay plan."  HANKEY confirmed that his long-term practice was to pay his executives based on profit growth, and that the structure of SIMMONS' agreement would also be focused on profit growth as well.  These discussions included assertions by HANKEY that with future growth of HANKEY GROUP company profits, that SIMMONS would be highly compensated, and would have many opportunities to invest in the HANKEY GROUP companies and individual deals as they arose in the future.

32.    In or about November 2013, SIMMONS again travelled to Los Angeles to engage in interviews with each of the presidents of the several HANKEY GROUP companies.  As part of that process, SIMMONS found that the tenure of the executives routinely exceeded a decade, and

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

some into three decades.  SIMMONS observed remarkable longevity and retention, and found that each of these executives was personally invested, having an ownership stake in at least one HANKEY GROUP company.  During this visit, HANKEY remarked that it was his plan to have SIMMONS be the future leader and that SIMMONS would be a "member of the family" for many years to come.

33.    HANKEY and his common-law spouse, Debbi, invited SIMMONS and his wife, Amanda, to spend the day after Christmas 2013 at HANKEY's home, including horseback riding and dinner.  Other visits followed throughout the spring of 2014 with SIMMONS and Amanda staying in the HANKEYS' guest house.  Indeed, throughout his employment, SIMMONS and his wife were invited by HANKEY and his wife to socialize often and repeatedly.

### SIMMONS and His Family Make Personal and Professional Sacrifices to Effectuate Their Move to Los Angeles.

34.    During the lengthy negotiation process, SIMMONS shared with HANKEY the concerns that he and his wife were having about relocating to Los Angeles.  Mrs. Simmons was concerned that their son with special needs, Jacob, would be adversely impacted by the move.  Mrs. Simmons had relied for years upon her own parents to provide a co-parenting role.  A move away to California would require more of her time and possibly the assistance of other professionals to care for him.  Mrs. Simmons' parents had paid for Jacob's private school since pre-Kindergarten, where he was able to receive attention to his special needs.

35.    SIMMONS communicated the fact that a relocation to Los Angeles meant that Mrs. Simmons would have to give up a well-paid position in Salt Lake City as a Sales Manager for McKesson, a position and market in which she had invested many years of effort to establish her reputation, network, and contacts.  Both SIMMONS and his wife expressed these concerns to HANKEY and Debbi, who both assured them that the long-term nature of the relationship with the HANKEY GROUP companies would justify the sacrifices that they, individually in their

8

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

own careers and also as a family, would have to make.  Debbi also personally assured Mrs.

Simmons in writing that all would work out with the move, including finding doctors for Jacob.

36.     Consistent with his wife's concerns, SIMMONS explored the possibility of a commute option that would allow SIMMONS to retain the family home in Salt Lake City, permit her to continue her career at McKesson, and prevent uprooting Jacob from the medical care and education system Mrs. Simmons had worked for many years to establish.

37.     HANKEY specifically refused to consider an arrangement for SIMMONS to work in Los Angeles during the workweek and then fly back to Salt Lake City on the weekends.  In response to his concerns, HANKEY spoke directly with Mrs. Simmons to assure her that the opportunity with the HANKEY GROUP would be long-term until retirement and that the money that SIMMONS would make with him would "surpass anything that you could imagine," or words to that effect.

38.     Relying upon these assurances, Mrs. Simmons proceeded to identify private schools in the Los Angeles area for Jacob, submitted applications to several schools, and made two separate trips with him to interview at the schools to determine the best fit.

39.     As further inducement, during the SIMMONS family's last trip to Los Angeles before accepting the offer, HANKEY asked the SIMMONS to consider buying a house near the office that was owned by HANKEY's son, Rufus, the Chairman of NOWCOM.  HANKEY offered to provide the equity loan needed for SIMMONS to get into a house, with a plan that HANKEY and the SIMMONS would share the profits upon sale.

40.     SIMMONS did not take advantage of the offer as the property was too large for his family's needs.

41.     As a result, SIMMONS discussed with HANKEY having to sell his family's home in Salt Lake City and rent in Los Angeles until he found an appropriate neighborhood.  Due to the

9

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

schedule of the parties' agreement, SIMMONS was forced to sell the Salt Lake City at a fifty thousand dollar ($50,000) loss.

**SIMMONS Begins Employment at the HANKEY GROUP with Great Success.**

42.     On June 2, 2014, SIMMONS commenced work with the HANKEY GROUP, assuming the title of Chief Investment Officer ("CIO").  However, within approximately a month, SIMMONS was "promoted" to President and COO of the HANKEY GROUP.  This occurred during a conversation in SIMMONS' office as HANKEY was approving the press release announcing SIMMONS as CIO.  HANKEY stated, "you've done such a good job and everyone likes you so much, that I'd like to give you the title of President – so that you have the clout and respect of everyone around here."

43.     Prior to June 2014, neither the CIO position nor the President role existed at the HANKEY GROUP companies.  The parties made no changes to any of the documents executed as part of SIMMONS coming aboard, either the job description, Pay Plan, or the terms of the relationship.

44.     During the first two months on the job, SIMMONS was in an investigatory and learning role, developing positive working relationships with all of the presidents of the seven HANKEY GROUP companies who reported directly to him.  Consistent with his 27 years of corporate management experience, SIMMONS understood that even seasoned executives typically spend the first few months at a new company in a largely observational role without making significant contributions to fiscal growth in the first six months.  Notwithstanding, HANKEY remarked to Ken Peterson and Jason Brock, an interviewing candidate, that SIMMONS was adding significant value within the first two months of his tenure.

45.     From June 2014 through his termination on October 1, 2015, it was SIMMONS' practice to stop by HANKEY's office every morning between 6:30 and 7:00 AM to discuss issues and

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

strategize for 30-60 minutes.  SIMMONS' usual practice was to request feedback on his job performance roughly once per week at their 6:30 AM meetings.  Each time, HANKEY responded with "good, everyone respects you, you're adding a lot of value, keep up the good work!" or words to that effect.

46.     Commencing in approximately September 2014, SIMMONS began to implement new ideas and changes where appropriate, and started new initiatives designed to promote growth in net income and increasing Return-on-Assets and Return-on-Equity across all the companies. These initiatives produced measurable positive results in the HANKEY GROUP companies.

**SIMMONS is Invited to Invest in HANKEY GROUP Companies About Six Months Into His Tenure.**

47.     In late October 2014, based on SIMMONS' strong performance and the value he had already added to the HANKEY GROUP companies, SIMMONS received an offer from HANKEY without solicitation to invest directly in WESTLAKE stock, providing a 65% advance rate loan at 8.5% interest.  SIMMONS reasonably understood HANKEY's offer to be a vote of confidence in his work performance because, based on his 27 years of corporate experience, underperforming executives are generally not provided such opportunities.

48.     In reliance on the expressions of positive performance and continued employment, SIMMONS drew down the remainder of the purchase price from his signing bonus in order to make the investment.  The investment took the form 10,000 shares of WESTLAKE interests at $20 per share—an investment of $200,000.  The investment made business sense to SIMMONS, even with a 65%  advance rate loan at 8.5% interest, because, based on the financial information HANKEY had provided to SIMMONS, WESTLAKE's expected dividend yield appeared to be in the 10-12% range.  To date, SIMMONS has not received any dividends or any proceeds from any repurchases of this stock.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

49.    Prior to investing in WESTLAKE, SIMMONS had been informed that the federal Consumer Finance Protection Bureau ("CFPB") had issued a Civil Investigative Demand ("CID") for potential racial disparate impact violations, but was assured by President Ian Anderson ("Mr. Anderson") and Counsel Tony Molino that the outcome of the disparate impact CID would likely be positive and no further actions would be necessary.

50.    Based upon his knowledge of the automated credit decision engine (the "Buy Program") used by WESTLAKE, SIMMONS reasonably believed it was unlikely that the CFPB would find disparate impact violations in WESTLAKE's lending practices.

51.    At the time SIMMONS invested in WESTLAKE, none of the owners or officers of WESTLAKE disclosed any other aspect of the CFPB investigation, nor the existence of another and much more troubling CID issued to WESTLAKE by the CFPB concerning potential violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA"), the Truth In Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA"), and the Consumer Financial Protection Act, 12 U.S.C. § 5567, *et seq.* ("CFPA").

52.    SIMMONS became aware that HANKEY arranged a scheme with a partner, Sean Dayani, with whom HANKEY shares office space and certain employees.  Dayani purports to invest in hard money commercial real estate loans, utilizing capital from HANKEY.  This business is conducted in cash, with HANKEY's investments disguised as "fees" payable to Dayani for services rendered.  HANKEY funnels capital from the HANKEY GROUP businesses into Dayani's loans—but accounts for the investments as accounts payable; i.e. operating expenses which are tax deductions to HANKEY's revenues.  HANKEY described Dayani to SIMMONS as a "cash man" who is able to help with taxes.  This practice has the effect of reducing HANKEY GROUP's taxable income while enriching HANKEY with tax-enhanced investments.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

53.     Based upon this information, SIMMONS concluded that it is highly probable that Dayani's investment vehicles are structured as a form of money laundering for, not only HANKEY's profits, but also off-shore investments from rom Dayani's Persian investment community.

54.     HANKEY recommended to SIMMONS that he structure a scheme with Dayani to reduce W-2 income by lowering SIMMONS' base salary and then funneling the difference to SIMMONS as "fees" payable to Amanda Simmons' wholly owned LLC.  HANKEY told SIMMONS that he has structured this scheme for several HANKEY GROUP employees so as to potentially reduce tax liabilities and hide income from divorced spouses.  Prior to a social engagement he arranged, Dayani warned Simmons to "not talk business" at the dinner—because Dayani's wife has no idea what he does for a living—despite having been married for 20 years.

**SIMMONS Implements Regulatory Compliance Infrastructure and Corporate Formalities at the HANKEY GROUP Companies Without Clear Resistance or Backlash From Anyone Other than HANKEY.**

55.     After learning about the disparate impact CID, SIMMONS recognized the need to address regulatory compliance deficiencies at WESTLAKE, and sought approval from HANKEY to hire an experienced and professional Chief Compliance Officer ("CCO").  Until this time, compliance at WESTLAKE had been addressed on a part-time basis under Brenda Moreno ("Ms. Moreno"), a seasoned training officer at WESTLAKE.  By her own admission, she was neither skilled nor experienced in compliance and thus appealed to SIMMONS for help. He wrote a CCO job description and strategized concerning hiring the best possible candidate for the position, contacting a recruiting firm, and holding detailed discussions on searching for candidates.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

56.      In response to SIMMONS' efforts to increase the focus on the HANKEY GROUP's regulatory compliance, HANKEY told him, "we don't use recruiters," and that SIMMONS should "put an ad in the L.A. Times and take phone calls yourself," or words to that effect.

57.      SIMMONS told HANKEY that a well-qualified candidate was unlikely to be found in that fashion; however, HANKEY persisted and refused to authorize the use of a recruiter for the CCO position at WESTLAKE.

58.      SIMMONS followed these instructions and requested WESTLAKE's Human Resources Department to assist in gathering candidates, including encouraging WESTLAKE's senior management to use their network to identify candidates.

59.      For the next four to five months, SIMMONS reviewed resumes obtained via LinkedIn, WESTLAKE executives' personal networks, and other online job posting sites gathered by WESTLAKE Human Resources, interviewing three promising candidates via WESTLAKE's management network.  Offers were made; however, none were accepted—primarily due to the CCO position's below-market compensation package and HANKEY's insistence that the successful candidate relocate within a close proximity to the mid-Wilshire headquarters of WESTLAKE.

60.      In October 2014, SIMMONS and his wife, Amanda, were invited to Bret Hankey's wedding at HANKEY's home.  While at the wedding, SIMMONS was approached separately by each of HANKEY's sons, Rufus and Bret, who each informed him that they were very lucky to have him as President of HANKEY GROUP and that this partnership and arrangement was going to work out well for years to come.

61.      During his first months in his new role, SIMMONS discovered that no annual shareholder or membership meetings were conducted at WESTLAKE or any of the other HANKEY GROUP companies.  WESTLAKE board meetings were generally held on an *ad hoc*

14

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

basis, as needed when major decisions arose in the normal course of business.  These *ad hoc* meetings and proposals occurred via e-mail and sometime by telephone—without any physical meetings taking place.

62.    SIMMONS sought to correct this lack of compliance and adherence to corporate formalities, seeking to establish formal monthly meetings with formal minutes prepared and board actions documented.  In response to SIMMONS' attempt to encourage compliance with corporate formalities, HANKEY refused to permit any such in-person meetings, noting that Rufus was disruptive and contentious with the other WESTLAKE board members.

63.    SIMMONS also proposed forming an independent advisory board to provide what he perceived as a much-needed objective viewpoint, or "reality check," on the corporate culture and decision-making at WESTLAKE.  SIMMONS worked closely with WESTLAKE management to lay the groundwork for the advisory board proposal.  He also recommended several highly qualified board candidates from large, multinational financial services companies.  However, HANKEY did not support this initiative, claiming that he had operated the HANKEY GROUP companies well for decades and that an outsider's viewpoint was of little value.

64.    In November and December 2014, SIMMONS structured and delivered an industry best-practices "Growth Playbook" program for each of the HANKEY GROUP companies.  Imported from SIMMONS' corporate leadership experience at General Electric, the widely known program tasked management of each of the HANKEY GROUP companies with the preparation and execution of three-year strategic plans and one-year financial plans, together with performance and accountability metrics, as a disciplined effort to grow profits, including through capital expenditures and a compliance structure necessary to support growth.  SIMMONS was unaware that HANKEY had any such strategic planning for growth structure in place prior to his arrival.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

65.    SIMMONS reviewed his Growth Playbook initiative with HANKEY, who endorsed and supported it.  Thereafter, SIMMONS personally and repeatedly met with the presidents of each HANKEY GROUP company to train, coach, and encourage each of them on the program's rollout.  To his great surprise, SIMMONS learned that the only president familiar with this set of basic corporate strategic planning practices was Mr. Anderson, who previously worked at the Ford Motor Company and had some background in growth planning and with an institutional corporate culture.  Nonetheless, SIMMONS was unaware of any president voicing or otherwise expressing opposition to his strategic leadership; rather, each president told him that they readily accepted and embraced the program.

66.    These completed Growth Playbooks instituted by SIMMONS would form the roadmaps for growing profits at the HANKEY GROUP in 2015—and were reviewed and compared with actual results on a monthly and quarterly basis to gauge performance and focus on any weaknesses that arose.

**HANKEY Continues to Praise and Socialize With SIMMONS Deep into 2015.**

67.    In March 2015, HANKEY and his wife invited SIMMONS and his wife to accompany them on a short vacation to Indian Wells, CA, where they attended the BNP Paribas Indian Wells tennis tournament and spent the weekend at a luxury estate.  On March 13, 2015, HANKEY hosted a dinner to celebrate SIMMONS' birthday.

68.    At the dinner party, SIMMONS was approached by HANKEY's sister, Barbara, who told SIMMONS how grateful she was that he was there to help Don and mentioned that she knew what a great job SIMMONS was doing with the HANKEY GROUP companies.

69.    HANKEY told SIMMONS, "you're doing great, keep up the good work," or words to that effect on a regular basis.  On June 1, 2015, SIMMONS sent an e-mail to HANKEY, commenting on the success of the past year and directly asking for constructive criticism on how

16

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

he could improve.  The next day, HANKEY replied positively: "Yes, it has been a great year and I am all for passing on more work.  I think you have respect for the position, we have the revenue increase going fine but the challenge now is to improve our spread!"  HANKEY also later responded with two suggestions: (1) drive the HANKEY GROUP company presidents to keep profit margins wide, and (2) "try to say a little less in meetings so that you don't diffuse what I'm saying to the presidents."  SIMMONS agreed to work hard to correct both of these criticisms.

### SIMMONS is Invited a Second Time to Invest in the HANKEY GROUP Less Than a Year Into His Tenure.

70.    On April 22, 2015, SIMMONS received another a second unsolicited invitation from HANKEY to purchase 1,000 shares of MIDWAY at $31.61 per share.  This time, however, HANKEY did not provide the 65% financing, but asked SIMMONS to draw down the entire investment amount from SIMMONS' signing bonus.  Nonetheless, SIMMONS reasonably believed that his work performance was satisfactory given that, after having observed his leadership for almost a year, HANKEY had incentivized his stake in the success of the HANKEY GROUP a second time.  Indeed, during that meeting, HANKEY told SIMMONS that he was very appreciative of his work and happy to have SIMMONS as President.  MIDWAY's president, Gary Macdonald, also personally thanked SIMMONS for his investment via e-mail.

71.    To date, SIMMONS has not received any dividends or any proceeds from any repurchases of this stock.

### SIMMONS Becomes Concerned by KNIGHT's Loss Reserve Practices.

72.    The method by which loss reserves were implemented at KNIGHT during 2015, troubled SIMMONS: namely, KNIGHT reserves had been increased to make up for years of dangerous, sub-standard under-reserving, which had the effect of artificially increasing profits and thus enriching KNIGHT's President and Chief Financial Officer.  While SIMMONS advocated for ensuring that losses were appropriately reserved at KNIGHT, the increasing loss reserves had the

17

effect of lowering profits by more than 50% for the previous six (6) months, not based upon any action or inaction by SIMMONS, but rather as a result of a lack of transparency and apparent disregard of corporate formalities at KNIGHT which SIMMONS was attempting to remedy at the time he was terminated.

73.    The KNIGHT loss reserves had the effect of significantly depressing the bonuses payable to SIMMONS.  The reserves should have been recognized in a single event, rather than as an ongoing charge, which had the effect of eliminating SIMMONS' bonus related to the year-over-year profitability of KNIGHT, calculated on a monthly basis.

74.    SIMMONS had for months requested that HANKEY and KNIGHT management utilize a consistently applied quantitative methodology for "right sizing" loss reserves which reserves were apparently estimated incorrectly prior to SIMMONS' arrival at HANKEY GROUP.  HANKEY refused and continued to apply various different, qualitative, and capricious adjustments to reduce profits by more than 50% from March 2015 through September 2015.

75.    Although KNIGHT's revenues continued to grow significantly through this period, the profits were manipulated to be much lower than the running rate if historical profit margins were applied.  If the loss reserves were "right sized" in one single month, the resulting profits would have been materially higher—resulting in an additional $108,000 of bonus payable under the Pay Plan.  When questioned about the varying and whimsical adjustments, HANKEY responded with, "well it lowers our tax bill to the IRS," or words to that effect.

**SIMMONS Engages in Protected Activity With Respect to a Second CID Issued by the CFPB Based on Illegal Practices Before His Tenure.**

76.    In mid to late May 2015, SIMMONS was informed by WESTLAKE personnel that the CFPB had terminated its CID regarding disparate racial impact with no further action.  Shortly thereafter, SIMMONS first learned of a second CID, issued approximately one year earlier, investigating potential violations of law regarding the FDCPA, CFPA, and TILA.  These

18

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

findings and violations of law had occurred during the period 2008-2012—long before SIMMONS' arrival at the HANKEY GROUP.  SIMMONS was shocked at the severity and frequency of the violations—as well as disappointed that the CID had not been disclosed earlier.

77.    In response to the disclosure of this second and more troubling collections practices CID from the CFPB, SIMMONS immediately drafted a compliance committee charter for the WESTLAKE board of directors, and accelerated efforts to hire a CCO.

78.    At that point, SIMMONS again approached HANKEY with a request to engage a professional recruiter to help WESTLAKE find a suitable CCO.  HANKEY begrudgingly agreed, ceding to the urgency and importance that this appointment would be necessary as part of any successful settlement discussions with the CFPB.  Though HANKEY embarrassed him by forcing a price renegotiation of a signed contract with the recruiter, SIMMONS was nonetheless able to quickly identify and recruit a candidate, who joined in late June 2015.

79.    In June 2015, HANKEY and SIMMONS had several e-mail exchanges, including one in which HANKEY congratulated SIMMONS on his performance over the past year, and complimented him on growing revenues and profit at the HANKEY GROUP companies.

80.    Recognizing the urgency of the CFPB situation, SIMMONS commenced a July 11, 2015 conference call by Eugene Leydiker and WESTLAKE's outside counsel, Bob Driscoll.  As chairman of the newly-formed Compliance Committee of the WESTLAKE Board of Directors, SIMMONS subsequently participated in every detail of preparations for negotiations with the CFPB.

81.    SIMMONS reviewed the CID, the response provided during the Notice and Opportunity to Respond and Advise ("NORA") process, and all other correspondence between WESTLAKE and the CFPB.  SIMMONS found that over the previous eight to 10 months—unbeknownst to

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

him—current and former WESTLAKE employees had been interviewed by CFPB investigators, and a large amount of documents, recorded calls, and other evidence had been produced.

82.    SIMMONS asked Ms. Moreno and WESTLAKE Chief Financial Officer Paul Kerwin ("Mr. Kerwin") to provide a full and detailed chronology of everything that had occurred over the preceding months with the CFPB.  SIMMONS questioned them as to why he had never been previously informed of the CID and the ongoing CFPB investigation, to which they responded that they thought SIMMONS knew and that they were managing it well on their own.

83.    SIMMONS pored over the recorded testimony from WESTLAKE personnel and management, as well as the allegations from CFPB, only to be shocked and very upset at the nature and severity of the alleged violations of law.  In reviewing this information, SIMMONS came to the conclusion that the evidence indicated that the alleged violations were indeed very serious, with potential criminal liability attached, and that a change in WESTLAKE upper management might be required to satisfy the CFPB.

84.    On July 20, 2015, SIMMONS wrote to the WESTLAKE Board of Directors, outlining the seriousness of the pending collections practices CID, and the approach that he, as the head of the Compliance Committee, in consultation with counsel, intended to take with respect to negotiations with the CFPB.

85.    SIMMONS, as President of the HANKEY GROUP companies, a board member and shareholder of WESTLAKE, and the chair of the Compliance Committee of the board of directors, participated as the board representative in negotiations with the CFPB in late July 2015.  He traveled to Washington D.C. with Mr. Kerwin to negotiate a settlement with the CFPB.  SIMMONS and Mr. Kerwin spent a day preparing with outside counsel to negotiate a resolution with the CFPB.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

86.     After leaving the preparation session, SIMMONS telephoned HANKEY and proposed part of a potential resolution with the CFPB: the resignation of certain individuals at WESTLAKE to demonstrate a marked change in the corporate culture, namely its president, Mr. Anderson.  SIMMONS informed HANKEY that such management changes could result in possibly millions in reduced fines and penalties.  HANKEY did not respond to SIMMONS' suggestion that the financial interests of WESTLAKE may be better served by offering the resignation of key personnel who had condoned and ratified illegal conduct.  SIMMONS took HANKEY's failure to respond as a very clear indication that such a management change would not occur.

87.     In preparation for the negotiations, SIMMONS and Mr. Kerwin reviewed other CFPB consent orders, including the November 19, 2014 Drivetime Automotive Group Consent Order (Case No. 2014-CFPB-0017).  In their discussions concerning that consent order, which included a civil monetary penalty ("CMP") of $8 million, Mr. Kerwin disclosed to SIMMONS that WESTLAKE was very lucky, and had dodged a bullet, or words to that effect, since WESTLAKE had engaged in many of the practices that were the subject of the Drivetime Consent Order.  Mr. Anderson, the president of WESTLAKE, also repeated the same sentiments to SIMMONS.  However, the CFPB had neither investigated nor included those additional violations of the CFPA and FDCPA.  This placed SIMMONS in a very difficult situation, as the both the President of the HANKEY GROUP companies and the head of the WESTLAKE Board of Directors Compliance Committee.

88.     The following day, SIMMONS and Mr. Kerwin engaged in nine hours of tense negotiations with the CFPB.  WESTLAKE management, including HANKEY, was kept apprised of the negotiation process via several phone calls from SIMMONS and Mr. Kerwin throughout the day.  When SIMMONS reached the point that he, Mr. Kerwin, and outside counsel thought

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

the best possible deal was on the table, SIMMONS contacted HANKEY and some other members of the board of WESTLAKE to recommend approval of the settlement proposal: $4.25 million in CMP and $40 million of consumer redress (of which only $26.7 million was cash out).

89.    SIMMONS believed that even this (without including management changes at WESTLAKE, which could have substantially reduced the CMP) was favorable when compared to the $103 million that CFPB had initially demanded.  HANKEY and the rest of the WESTLAKE board approved the settlement proposal.

90.    After his return to Los Angeles, on July 30, 2015, SIMMONS issued a Memorandum to the WESTLAKE Board of Directors reporting on the negotiations, the agreement, and spoke specifically about a "further ramp up of our compliance function."

91.    SIMMONS spoke about the issue again several times with HANKEY from July 24, 2015 until September 10, 2015, when the CFPB transmitted the first draft of the Consent Order and settlement.  In at least two of those meetings, SIMMONS reiterated the fact that a change in WESTLAKE management could have a substantial impact in reducing the fines and punishments in the consent order and settlement.  HANKEY did not respond to SIMMONS' entreaties to save WESTLAKE and its member owners potentially millions in fines and penalties.

92.    The CFPB took approximately six (6) weeks to prepare a draft of the Consent Order. SIMMONS and others negotiated particular terms of the Consent Order for approximately one week before a final agreement was reached.  SIMMONS kept HANKEY informed on the specific details of the negotiation of terms.  To SIMMONS, it appeared that HANKEY was uninterested in the details of the Consent Order and simply wished to settle the matter and move on.

93.    During the waiting period to receive the draft of the Consent Order from CFPB, Eiichiro Ito ("Mr. Ito") of Marubeni (a 20% owner of WESTLAKE) made almost daily visits to

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

SIMMONS' office to inquire about the details of what the settlement would look like.  Mr. Ito was collecting the information to make specific reports and recommendations to Marubeni's head office in Tokyo, Japan.  Before this time, personal interactions between Mr. Ito and SIMMONS were infrequent.  SIMMONS' understanding was that Mr. Ito perceived him as an objective and unbiased information source, someone who had no motivation to "sugar coat" or cover up, but rather provide unvarnished opinions and reports.

### **SIMMONS Engages in Further Protected Activity.**

94.    On September 23, 2015, SIMMONS sent an e-mail to the WESTLAKE Board of Directors and the presidents of each of the HANKEY GROUP companies, attaching a recent news article concerning the firing of Volkswagen's CEO in the aftermath of the emissions tampering scandal:

> Not to be too dramatic, but this is what happens to companies and their corporate leaders when their company is found to be massively violating laws and to be non-compliant.  This company is the world's largest automobile manufacturer and will be condemned and damaged for decades.  Their stock is down 33% in past week.  We haven't even seen the fines that they'll pay to regulators in all of the countries where they sell diesels.  Nor have we seen the class action suits from shareholders and buyers of their cars… They'll probably have to file bankruptcy and will likely be swallowed up by one of their competitors.  This scandal may be the death of VW.

> In this context, it makes me feel very grateful that we have greatly stepped up our compliance focus and efforts.  Over the next 90 days, we will be fully implementing a world class compliance management system and then closely monitor and test on a continuous and regular basis – under Robert Engilman's guidance and leadership.  A key part of this CMS will be self-policing and self-reporting – so that when things do happen that we can't control (and they will), we will identify them early, remedy them promptly and report them appropriately.

> Someday in the future we'll look back on our recent experience with the CFPB and think, "well that wasn't so bad – and it sure gave us a wakeup call to get our house in order"…

95.    SIMMONS's warning was unmistakable: compliance is mission-critical.  SIMMONS stated that he was grateful that the HANKEY GROUP companies were going to implement a

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

world-class compliance management system under the leadership of Robert Engilman (the newly hired CCO), which had been presented to the CFPB during the negotiation process.  This e-mail caused a stir amongst WESTLAKE management and HANKEY.

96.    At the close of September 2015, this time, HANKEY and WESTLAKE management were aware of the following facts:

(1) HANKEY recruited SIMMONS as a President of a group of companies, the largest of which was facing a very serious collections practices CID that HANKEY never disclosed to SIMMONS at the time;

(2) HANKEY asked SIMMONS to invest hundreds of thousands of dollars in WESTLAKE without disclosing the very serious collections practices CID;

(3) HANKEY impeded SIMMONS' attempts to quickly place a CCO at WESTLAKE for months before the very serious collections practices CID was disclosed to SIMMONS;

(4)  SIMMONS had imposed on the WESTLAKE Board of Directors a Compliance Committee that it had never had in its 35-year history;

(5)  SIMMONS had informed HANKEY and Mr. Kerwin that changes in WESTLAKE senior management would have a substantial positive financial impact upon the CFPB Consent Order, likely in the millions of dollars;

(6) Mr. Kerwin had made SIMMONS aware of additional substantial violations of the CFPA and FDCPA committed by WESTLAKE that were not on the CFPB's radar and for which other consumer finance companies (e.g., Drivetime) had been fined $8 million;

(7)  SIMMONS sent a warning e-mail to HANKEY and the WESTLAKE Board of Directors that was perceived as a threat by HANKEY that SIMMONS would force additional compliance at WESTLAKE, even if it meant turning in those responsible for as-yet undisclosed illegal collections practices that had been hidden from SIMMONS until July 2015;

(8) SIMMONS specifically objected to WESTLAKE's use of a phone number spoofing application called "Noble Biz" which WESTLAKE intended to use after the negotiation of the Consent Order, and refused to go along with the use of an application that would violate the terms of the Consent Order, and incur third-tier "knowing" penalties from the CFPB.

97.    Five days later, on or about September 28, 2015 and on the recommendation of SIMMONS, he and all members of the WESTLAKE board signed the CFPB Consent Order and

24

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

returned it to CFPB. Under the Consent Order, the penalty and consumer redress payments were due to be paid by WESTLAKE in October 2015. As a result, WESTLAKE reported a $28 million loss for the month of September 2015. This allegedly was the first-ever loss taken by WESTLAKE in its 35-year history. The Consent Order was signed and made effective by the Director of the CFPB on September 30, 2015.

98. The following day, on October 1, 2015, the CFPB issued a detailed press release, entitled "CFPB Orders Indirect Auto Finance Company to Provide Consumers $44.1 Million in Relief for Illegal Debt Collection Tactics – Westlake Services and Wilshire Consumer Credit Pressured Borrowers with Illegal Threats and Phony Caller Ids."

99. The press release used terms such "illegal threats and deceptive phone calls," "Wilshire deceived borrowers," and "illegal and inexcusable practices." That same day, HANKEY asked SIMMONS to sit down, and then terminated him without warning, telling him that their "arrangement wasn't working and would not work out," or words to that effect. SIMMONS asked HANKEY what specifically was not working for him. HANKEY could not articulate a reason, stating only that he "could not put his finger on it." SIMMONS was understandably shocked at this devastating blow to his career.

100. HANKEY instructed SIMMONS to leave the office and meet him for lunch the following Monday. HANKEY and SIMMONS met as scheduled. When HANKEY sat down, he pushed a piece of paper across the table which indicated that HANKEY claimed that SIMMONS owed him more than two hundred thousand ($200,000) dollars, and that no bonus would be payable to SIMMONS.

101. SIMMONS was doubly shocked and surprised at the timing and nature of the "firing," in the face of continuous assurances of positive performance, without notice and only days after participating in the conclusion of the investigation and negotiation with the CFPB. To then be

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

handed a demand for in excess of $200,000 without being paid his final wages and bonuses added insult to injury.

102.    SIMMONS pointed out to HANKEY that the Pay Plan was very specific as to the calculation method (i.e., percentage of profits above the previous year's profits) and that, in fact, SIMMONS was owned in excess of two hundred thirty thousand dollars ($230,000) as bonus for the months of January 2015 through September 2015.

103.    SIMMONS also informed HANKEY that since HANKEY was terminating the relationship, the repayment provisions for the signing bonus has not not been triggered, and no repayment could occur, given that HANKEY was terminating the relationship before the term of repayment had ended.

104.    After his termination, multiple HANKEY GROUP company presidents sent LinkedIn messages to SIMMONS expressing their shock and disbelief that he had been terminated.  Each of them expressed gratitude and appreciation for all the value he added.

105.    Since his termination, Defendants have presented a contrived *post hoc* rationalization that SIMMONS' termination was based on declines in HANKEY GROUP financials in 2015 and poor performance.  This conclusion is based on verifiably misleading information, including, *inter alia*, financial activity after SIMMONS' termination (September-December 2015) and the bottom-line effect of paying CFPB fines and penalties for illegal practices that occurred before his employment.  Additionally, any overall fiscal underperformance by Defendants is also reasonably attributable in part to the aforementioned deliberate choice by KNIGHT management to under-reserve cash to create the appearance of higher profits before SIMMONS's employment. In turn, KNIGHT began to make corrective measures in 2015 by over-reserving, thus diminishing the appearance of profit growth.  In reality, notwithstanding the over-reserving at KNIGHT, the total profits for all HANKEY GROUP companies, year over year, during the 16

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

months of SIMMONS' tenure, increased by approximately $40 million, or 9.1%.  When

KNIGHT's profits are normalized, the increase is almost $53 million, or 12.2%.

### ALLEGATIONS CONCERNING ARBITRABILITY AND EXHAUSTION OF ADMINISTRATIVE REMEDIES

106.    On May 7, 2014, SIMMONS allegedly signed a "Dispute Resolution Agreement" prior to

the commencement of his employment which contained a paragraph entitled, "Agreement to

Arbitrate":

> Except as otherwise provided in this Agreement, the Company and the Employee hereby consent to the resolution by arbitration of all claims or controversies, for which a court otherwise would be authorized by law to grant relief, in any way arising out of, relating to, or associated with the Employee's employment with the Company, or its termination (hereinafter "Claims"), that the Company may have against the Employee or that the Employee may have against the Company or against its officers, directors, employees or agents in their capacity as such or otherwise.

107.    The "Dispute Resolution Agreement" also contained a paragraph entitled, "Claims Not

Covered by Agreement":

> This Agreement does not apply to or cover claims for workers' compensation benefits; claims for unemployment compensation benefits; claims by the Employee for injunctive and/or other equitable relief for defamation; claims by the Company for injunctive and/or other equitable relief for unfair competition and/or the unauthorized disclosure of trade secrets or confidential information; and claims based upon an employee pension or benefit plan, the terms of which contain an arbitration or other nonjudicial dispute resolution procedure, in which such case the provisions of such plan shall apply.

108.    SIMMONS acknowledges the "Dispute Resolution Agreement" for the purposes of

pleading without conceding either that: (1) valid contract formation had occurred; or that (2) the

arbitration clause itself was legally enforceable under prevailing standards.

109.    On January 6, 2016, SIMMONS, by and through his undersigned counsel, filed a lawsuit

in Los Angeles County Superior Court, alleging all claims above except for the federal claim.

110.    On February 18, 2016, SIMMONS dismissed the Los Angeles County action without

prejudice.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

111.    On December 2, 2015, SIMMONS, by and through his counsel of record, had filed a Whistleblowing Retaliation Complaint with the United States Department of Labor-Occupational Safety & Health Administration (hereinafter "OSHA") pursuant to the CFPA (12 U.S.C. § 5567, *et seq.*).  This complaint was timely based on his October 1, 2015 termination date.  *See* 12 U.S.C. § 5567(c)(1)(A).

112.    Pursuant to the CFPA, SIMMONS is permitted to seek redress in this Court because 210 days have passed since the filing of his OSHA complaint without a final order from the Secretary of Labor.  12 U.S.C. § 5567(c)(4)(D)(i).  SIMMONS thereby has exhausted all necessary administrative remedies prior to the commencement of this lawsuit.

113.    To whatever extent that the above-mentioned arbitration clause was valid and legally enforceable, SIMMONS' claim for Retaliation in violation of the CFPA is not subject to arbitration.  12 U.S.C. § 5567(d).

**FIRST CLAIM**
**RETALIATION IN VIOLATION OF THE**
**CONSUMER FINANCIAL PROTECTION ACT OF 2010**
**(12 U.S.C. § 5567, *et seq.*)**
(Alleged by Plaintiff against all Defendants)

114.    As a first, separate and distinct claim, Plaintiff complains of Defendants and DOES 1-50, inclusive, and for a claim alleges:

115.    The factual allegations of Paragraphs 1 through 113 above, are re-alleged and incorporated herein by reference.

116.    In relevant part, the CFPA provides that no covered person or service provider shall terminate or in any other way discriminate against, or cause to be terminated or discriminated against, any covered employee or any authorized representative of covered employees by reason of the fact that such employee or representative, whether at the initiative of the employee or in

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

the ordinary course of the duties of the employee (or any person acting pursuant to a request of the employee), has—

> provided, caused to be provided, or is about to provide or cause to be provided, information to the employer, the Bureau, or any other State, local, or Federal, government authority or law enforcement agency relating to any violation of, or any act or omission that the employee reasonably believes to be a violation of, any provision of this title or any other provision of law that is subject to the jurisdiction of the Bureau, or any rule, order, standard, or prohibition prescribed by the Bureau; or

> objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed to be in violation of any law, rule, order, standard, or prohibition, subject to the jurisdiction of, or enforceable by, the Bureau.

117.   As demonstrated above, SIMMONS was a "covered employee" in that he performed tasks related to the offering or provision of a consumer financial product or service by serving as the President and COO of the HANKEY GROUP, which includes WESTLAKE, as well as the head of the Board of Directors' Compliance Committee for WESTLAKE, a provider of subprime car loans to individual consumers.  12 U.S.C. § 5567(b); 12 U.S.C. §§ 5481(5), (15)(A)(i).

118.   The CFPB has found that WESTLAKE, which specializes in purchasing and servicing subprime and near-subprime auto loans, it is a "covered person" within the meaning of the CFPA, 12 U.S.C. § 5481(6).  (September 30, 2015 Consent Order, Case No. 2015-CFPB-0026, ¶¶ 4, 6).

119.   Throughout 2015, up through the termination of his employment, SIMMONS engaged in activities protected by the CFPA, to wit, SIMMONS participated in the investigation and negotiation of a Consent Order with the CFPB throughout the summer of 2015 regarding WESTLAKE's alleged violations of FDCPA, CFPA, and TILA, as described in the Consent Order that resulted from the second CID: e.g., 12 U.S.C. §§ 5531(a), 5536(a)(1); 15 U.S.C. §§ 1692c(b), 1692e(5), (10), and (14); 15 U.S.C. §§ 1664 and1665a; 12 C.F.R. §§ 1026.24(c) and 1026.26(b).  (September 30, 2015 Consent Order, Case No. 2015-CFPB-0026).

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

120.     SIMMONS further engaged in protected activity by sending communications to each of the chief executives of the HANKEY GROUP member companies, stating that SIMMONS would enforce the reporting of the violations of law or the CFPB Consent Order based on alleged violations of the FDCPA, CFPA, and TILA, e.g., 12 U.S.C. §§ 5531(a), 5536(a)(1); 15 U.S.C. §§ 1692c(b), 1692e(5), (10), and (14); 15 U.S.C. §§ 1664 and1665a; 12 C.F.R. §§ 1026.24(c) and 1026.26(b).  (September 30, 2015 Consent Order, Case No. 2015-CFPB-0026).

121.     SIMMONS further engaged in protected activity by refusing to permit the use at WESTLAKE of a telephone-number-spoofing application, "Noble Biz," in order to circumvent the strictures of the CFPB Consent Order.  (*See e.g.,* September 30, 2015 Consent Order, Case No. 2015-CFPB-0026, ¶¶ 23-28) (concluding that deceptive caller ID practices by, *inter alia*, WESTLAKE constituted violations of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)).

122.     Defendants perceived that SIMMONS had reported, or was about to report violations of law to regulatory and law enforcement authorities.

123.     SIMMONS suffered adverse employment actions of termination and failure to pay all wages, salary, and bonuses.

124.     SIMMONS' protected activities, and the perceptions that SIMMONS would report further violations of federal law to regulators and/or law enforcement was the cause of the adverse employment actions suffered by Plaintiff.

125.     At all relevant times, Defendants, and each of them, and their agents, and/or officers, engaged in and/or ratified by their actions and/or inaction through their employees and/or supervisors, the false representations of existing material facts.

126.     As a proximate result of Defendant's wrongful acts, Plaintiff has suffered and continues to suffer substantial losses incurred in seeking substitute employment and in earnings, bonuses,

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

deferred compensation, stock options, seniority, and other employment benefits; and has suffered and continues to suffer emotional distress in an amount according to proof at the time of trial.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

## SECOND CLAIM
## BREACH OF CONTRACT
(Alleged by Plaintiff against all Defendants)

127.    As a second, separate and distinct claim, Plaintiff complains of Defendants and DOES 1-50, inclusive, and for a claim, alleges:

128.    The factual allegations of Paragraphs 1 through 126 above, are re-alleged and incorporated herein by reference.

129.    Plaintiff and Defendants engaged in the negotiation of a contract of employment, which was both written and oral.

130.    The contract required Plaintiff to become President and COO of Defendant HANKEY GROUP, an unincorporated association, to become a board member of WESTLAKE and NOWCOM, members of HANKEY GROUP, and was to be employed by Defendants and each of them in one or more capacities from June 2014 to October 2015.

131.    In exchange for his promise to become President and COO of Defendant HANKEY GROUP, the contract provided that SIMMONS would be paid no more than $900,000 for each of the first three years of the contract, and that thereafter, his compensation would be unlimited, and based upon the monthly year-over-year growth in profits of each of the HANKEY GROUP companies.

132.    The contract provided that SIMMONS would not be terminated except for cause, such as poor performance.

133.    SIMMONS complied with all his obligations and duties, under the contract, providing superior leadership in his roles as President and COO of Defendant HANKEY GROUP, and

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

member of the board of directors of WESTLAKE and NOWCOM, member companies of HANKEY GROUP.

134.    Defendants, and each of them, breached the contract by terminating SIMMONS from his position as President and COO of HANKEY GROUP, and member of the board of directors of each of the HANKEY GROUP member companies, and by failing to pay him all monies and perquisites due under the contract.

135.    As a direct result of the foregoing actions and conduct of Defendants, Plaintiff has suffered contract damages in an amount to be proven at trial.

136.    At all relevant times, Defendants, and each of them,  and their agents, and/or officers, engaged in and/or ratified by their actions and/or inaction through their employees and/or supervisors, resulting in Defendants' breach of contract.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

**THIRD CLAIM**
**WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**
(***TAMENY***)
(Alleged by Plaintiff against all Defendants)

137.    As a third, separate and distinct claim, Plaintiff complains of Defendants and DOES 1-50, inclusive, and for a claim, alleges:

138.    The factual allegations of Paragraphs 1 through 136 above, are re-alleged and incorporated herein by reference.

139.    Plaintiff was employed by Defendants and each of them in one or more capacities from June 2014 to October 2015.

140.    Defendants terminated Plaintiff's employment on October 1, 2015.

141.    Plaintiff's employment was terminated in direct violation of a strong and well-established public policies: the prohibitions in Cal. Lab. Code § 1102.5 and 12 U.S.C. § 5567 against retaliation for reporting, being about to report, or perceived as reporting or about to report

32

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

violations of law and regulation; the ban under on retaliatory termination pursuant to Cal. Lab. Code § 98.6; the ban on false statements concerning the nature of employment and inducement to relocate over state lines pursuant to Cal. Lab. Code § 970; and prohibition on unfair and deceptive practices pursuant to Cal. Bus. & Prof. Code § 17200, *et. seq.*

142.    The foregoing provisions of federal and state law set forth well-established policies of the United States of America and the State of California, are substantial and fundamental, and benefit the public at large, not just Plaintiff SIMMONS.

143.    Defendants' termination of SIMMONS employment was motivated, in whole or substantially in part, by the Defendants' violations of the foregoing statutory provisions.

144.    In doing the acts and engaging in the conduct herein alleged, Defendants intended to and did vex, harass, annoy, and cause Plaintiff to suffer and continue to suffer emotional distress.

145.    As a direct and legal result of said actions and conduct of Defendants, Plaintiff has suffered damages for loss of earnings, loss of future earnings, and related employment benefits and opportunities in an amount to be proven at trial.

146.    At all relevant times, Defendants, and each of them, and their agents, and/or officers, engaged in and/or ratified by their actions and/or inaction through their employees and/or supervisors, acts of retaliation against Plaintiff based upon his protected activities.

147.    As a direct and proximate result of the willful, knowing, and intentional acts against him, Plaintiff has suffered physical and mental distress, anguish, and indignation.  Plaintiff is thereby entitled to general and compensatory damages in an amount to be proven at trial.

148.    Defendants' acts alleged herein are malicious, oppressive, despicable, and/or in reckless disregard of Plaintiff's rights.  As such, punitive and exemplary damages are warranted against Defendants in order to punish and make an example of their actions.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## FOURTH CLAIM
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
(Alleged by Plaintiff against all Defendants)

149.    As a fourth, separate and distinct claim, Plaintiff complains of Defendants and DOES 1-50, inclusive, and for a claim alleges:

150.    The factual allegations of Paragraphs 1 through 148 above, are re-alleged and incorporated herein by reference.

151.    Defendants actions' in terminating Plaintiff without cause breached the implied covenant of good faith and fair dealing implied in all contracts.

152.    Defendants furthermore took actions to decrease the profitability of KNIGHT during 2015, thereby depriving Plaintiff of the benefits of the contract, to wit, a bonus based upon the monthly year-over-year increase in the profits of KNIGHT.

153.    Defendants furthermore took actions which deprived Plaintiff of the benefit of the contract by failing to disclose the second CFPB collections actions CID, which had a materially adverse impact upon the value of WESTLAKE.

154.    As a proximate result of Defendant's wrongful acts, Plaintiff has suffered and continues to suffer substantial losses incurred in seeking substitute employment and in earnings, bonuses, deferred compensation, stock options, seniority, and other employment benefits; and has suffered and continues to suffer emotional distress in an amount according to proof at the time of trial.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

## FIFTH CLAIM
## VIOLATION OF CAL. LAB. CODE §§ 970, 972
(Alleged by Plaintiff against all Defendants)

155.    As a fifth, separate and distinct claim, Plaintiff complains of Defendants and DOES 1-50, inclusive, and for a claim alleges:

34

156.    The factual allegations of Paragraphs 1 through 154 above, are re-alleged and incorporated herein by reference.

157.    Defendants induced SIMMONS to relocate his family from Salt Lake City, Utah to Los Angeles, California, and to sell his home in Salt Lake City, based upon inducements to SIMMONS concerning the nature and extent of employment with Defendants, including the amount of compensation and effect of the move on SIMMONS' 11-year-old stepson, Jacob, who had support for his mental health issues (e.g., established medical care, support from his grandparents, and educational specialists) in Utah—but not in California.

158.    Defendants induced SIMMONS by representing (1) that Defendants would not require repayment of a five hundred thousand dollar ($500,000) signing bonus after three years of positive performance; (2) that Defendants would pay SIMMONS bonuses based upon the monthly year-over-year increase in profits of the HANKEY GROUP businesses, and would also refrain from bad faith actions designed to diminish the monthly profit of the HANKEY GROUP companies, such as KNIGHT, in order to reduce the bonus payable to SIMMONS; (3) that HANKEY and the HANKEY GROUP constituent companies would not violate the Labor Code, including §§ 203, 970 and 1102.5, in the employment relationship with SIMMONS; and (4) that the HANKEY GROUP companies were not in substantial and material non-compliance with applicable law and regulation.  All the foregoing representations were known to by false, were objectively and demonstrably false, and were made with the intent to induce reliance by SIMMONS and his family based upon those factual misrepresentations.

159.    As set forth above, SIMMONS relied on both written and oral representations by HANKEY, Debbi Hankey, Brett Hankey, and others regarding the kind, character, existence, and compensation of work in determining whether to relocate from Utah to California.

35

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

160.    Had HANKEY, Debbi Hankey, and others not made such oral and written representations, SIMMONS would not have left a promising career with potentially unlimited advancement at Zions Bancorporation, uprooted his life to move to another state for the sole purpose of working for HANKEY and the HANKEY GROUP.

161.    Pursuant to  Cal. Lab. Code § 970, it is unlawful for an employer to influence an employee to change his or her residence by misrepresentations about the character of work, including the nature of compensation for the same.

162.    Pursuant to Cal. Lab. Code § 972, SIMMONS is entitled to recover a civil penalty of double damages resulting from the misrepresentation.

163.    At all relevant times, Defendants, and each of them, and their agents, and/or officers, engaged in and/or ratified by their actions and/or inaction through their employees and/or supervisors, the false representations of existing material facts.

164.    As a direct and legal result of SIMMONS' justifiable reliance upon HANKEY's false representations of existing material facts, SIMMONS has been damaged in an amount to be proven at trial.

165.    As a proximate result of Defendant's wrongful acts, Plaintiff has suffered and continues to suffer substantial losses incurred in seeking substitute employment and in earnings, bonuses, deferred compensation, stock options, seniority, and other employment benefits; and has suffered and continues to suffer emotional distress in an amount according to proof at the time of trial.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

///

///

///

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## SIXTH CLAIM
## VIOLATION OF CAL. LAB. CODE § 203
(Alleged by Plaintiff against all Defendants)

166.    As a sixth, separate and distinct claim, Plaintiff complains of Defendants and DOES 1-50, inclusive, and for a claim alleges:

167.    The factual allegations of Paragraphs 1 through 165 above, are re-alleged and incorporated herein by reference.

168.    Defendants terminated SIMMONS' employment on October 1, 2015.

169.    At the time Defendants terminated SIMMONS' employment, Defendants failed to pay SIMMONS all remuneration, including salary, wages, bonuses, and other remuneration due and payable to SIMMONS, including hundreds of thousands of dollars in earned bonuses.

170.    As a proximate result of Defendant's wrongful acts, Plaintiff has suffered and continues to suffer substantial losses incurred in seeking substitute employment and in earnings, bonuses, deferred compensation, stock options, seniority, and other employment benefits; and has suffered and continues to suffer emotional distress in an amount according to proof at the time of trial.

171.    Pursuant to Cal. Lab. Code § 203, SIMMONS is entitled to waiting time penalties.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

## SEVENTH CLAIM
## VIOLATION OF CAL. LAB. CODE § 221
(Alleged by Plaintiff against all Defendants)

172.    As a seventh, separate and distinct claim, Plaintiff complains of Defendants and DOES 1-50, inclusive, and for a claim alleges:

173.    The factual allegations of Paragraphs 1 through 171 above, are re-alleged and incorporated herein by reference.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

174.    At the time Defendants terminated SIMMONS' employment, Defendants withheld from payment to SIMMONS amounts Defendants claimed were owing by SIMMONS to Defendants.

175.    Cal. Lab. Code § 221 prohibits an employer from deducting amounts from an employee's wages, even as a setoff for amounts clearly owed by the employee.  This prohibition reflects California's strong public policy favoring the protection of employees' wages, including amounts earned through commissions on sales.

176.    California Labor Code § 221's rights are non-negotiable and cannot be waived by the parties.  By enacting California Labor Code § 221, the Legislature has prohibited employers from using self-help to take back any part of wages theretofore paid to the employee, except in very narrowly defined circumstances provided by statute.

177.    At all relevant times, Defendants, and each of them, and their agents, and/or officers, engaged in and/or ratified by their actions and/or inaction through their employees and/or supervisors, the false representations of existing material facts.

178.    As a proximate result of Defendant's wrongful acts, Plaintiff has suffered and continues to suffer substantial losses incurred in seeking substitute employment and in earnings, bonuses, deferred compensation, stock options, seniority, and other employment benefits; and has suffered and continues to suffer emotional distress in an amount according to proof at the time of trial.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

## EIGHTH CLAIM
## WHISTLEBLOWER RETALIATION IN VIOLATION OF
## CAL. LAB. CODE § 1102.5
(Alleged by Plaintiff against all Defendants)

179.    As a eighth, separate and distinct claim, Plaintiff complains of Defendants and DOES 1-50, inclusive, and for a claim alleges:

38

180.   The factual allegations of Paragraphs 1 through 178 above, are re-alleged and incorporated herein by reference.

181.   Throughout 2015, up through the termination of his employment, SIMMONS engaged in activities protected by Cal. Lab. Code § 1102.5, to wit, SIMMONS participated in the investigation and negotiation of a Consent Order with the CFPB throughout the summer of 2015 regarding WESTLAKE's alleged violations of FDCPA, CFPA, and TILA, as described in the Consent Order that resulted from the second CID: e.g., 12 U.S.C. §§ 5531(a), 5536(a)(1); 15 U.S.C. §§ 1692c(b), 1692e(5), (10), and (14); 15 U.S.C. §§ 1664 and1665a; 12 C.F.R. §§ 1026.24(c) and 1026.26(b).  (September 30, 2015 Consent Order, Case No. 2015-CFPB-0026).

182.   SIMMONS further engaged in protected activity by sending communications to each of the chief executives of the HANKEY GROUP member companies, stating that SIMMONS would enforce the reporting of the violations of law or the CFPB Consent Order based on alleged violations of the FDCPA, CFPA, and TILA, e.g., 12 U.S.C. §§ 5531(a), 5536(a)(1); 15 U.S.C. §§ 1692c(b), 1692e(5), (10), and (14); 15 U.S.C. §§ 1664 and1665a; 12 C.F.R. §§ 1026.24(c) and 1026.26(b).  (September 30, 2015 Consent Order, Case No. 2015-CFPB-0026).

183.   SIMMONS further engaged in protected activity by refusing to permit the use at WESTLAKE of a telephone-number-spoofing application, "Noble Biz," in order to circumvent the strictures of the CFPB Consent Order.  (*See e.g.*, September 30, 2015 Consent Order, Case No. 2015-CFPB-0026, ¶¶ 23-28) (concluding that deceptive caller ID practices by, *inter alia*, WESTLAKE constituted violations of theCFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)).

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

184.    SIMMONS further engaged in protected activity by sending communications to each of the chief executives of the HANKEY GROUP member companies, stating that SIMMONS would enforce the reporting of the violations of law or the CFPB consent decree.

185.    SIMMONS further engaged in protected activity by refusing to permit the use at WESTLAKE of a telephone-number-spoofing application, "Noble Biz," in order to circumvent the strictures of the CFPB Consent Order.

186.    Defendants perceived that SIMMONS had reported, or was about to report violations of law to regulatory and law enforcement authorities.

187.    SIMMONS suffered adverse employment actions of termination and failure to pay all wages, salary, and bonuses.

188.    SIMMONS' protected activities, and the perceptions that SIMMONS would report further violations of federal law to regulators and/or law enforcement was the cause of the adverse employment actions suffered by Plaintiff.

189.    At all relevant times, Defendants, and each of them, and their agents, and/or officers, engaged in and/or ratified by their actions and/or inaction through their employees and/or supervisors, the false representations of existing material facts.

190.    As a proximate result of Defendant's wrongful acts, Plaintiff has suffered and continues to suffer substantial losses incurred in seeking substitute employment and in earnings, bonuses, deferred compensation, stock options, seniority, and other employment benefits; and has suffered and continues to suffer emotional distress in an amount according to proof at the time of trial.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

**NINTH CLAIM**
**UNFAIR PRACTICES IN VIOLATION OF**
**CAL. BUS. & PROF. CODE § 17200, *ET. SEQ.***
(Alleged by Plaintiff against all Defendants)

40

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

191.    As a ninth, separate and distinct claim, Plaintiff complains of Defendants and DOES 1-50, inclusive, and for a claim alleges:

192.    The factual allegations of Paragraphs 1 through 188 above, are re-alleged and incorporated herein by reference.

193.    Cal. Bus. & Prof. Code § 17200, *et. seq*. defines "unfair competition" broadly to include "any unlawful, unfair or fraudulent business act or practice."

194.    Defendants have engaged in unfair, unlawful, and fraudulent business acts and practices, to wit: (1) violating Cal. Lab. Code §§ 203, 221, 970, 972, and 1102.5; (2) misrepresenting the terms and conditions of employment, employment-related bonuses and loans, and remuneration; and (3) failing to pay all wages, salary, bonuses, and remuneration when due.

195.    At all relevant times, Defendants, and each of them, and their agents, and/or officers, engaged in and/or ratified by their actions and/or inaction through their employees and/or supervisors.

196.    As a proximate result of Defendant's wrongful acts, Plaintiff has suffered and continues to suffer substantial losses and unpaid wages.

197.    Cal. Bus. & Prof. Code § 17200 provides for restitution and injunctive relief, including the recovery of unpaid wages.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

**TENTH CLAIM**
**FALSE LIGHT**
(Alleged by Plaintiff against all Defendants)

198.    As an tenth, separate and distinct claim, Plaintiff complains of Defendants and DOES 1-50, inclusive, and for a claim alleges:

199.    The factual allegations of Paragraphs 1 through 195 above, are re-alleged and incorporated herein by reference.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

200.    The timing and nature of the termination of SIMMONS' employment—simultaneously with the CFPB press release on the WESTLAKE consent order—implied that SIMMONS was at fault for the underlying illegal conduct that caused the collections practices CID in the first instance.

201.    This false implication of fact has negatively impacted SIMMONS' professional reputation and has severely damaged his long-term earning capacity.

202.    By terminating SIMMONS on the day the CFPB made public the illegal activities at WESTLAKE, Defendants placed SIMMONS in a false light.

203.    The false implication is heightened by the press release issued by the HANKEY GROUP in August 2014 announcing SIMMONS' leaving Zions Bancorporation to become the President and COO of the HANKEY GROUP.

204.    This press release was widely reported by Bloomberg and Reuters, amongst others. Those news accounts, combined with the CFPB's October 1, 2015 press release, with SIMMONS' purported termination on the same day, cast SIMMONS in an incredibly false and negative light: that the person who strived diligently for sixteen (16) months to root out illegal activity and instill a culture of compliance at the HANKEY GROUP companies, should be terminated on the date the Consent Order is made public, create only one impression: SIMMONS was the cause of the non-compliance.  That impression is an anathema to SIMMONS' hard-earned reputation as a financial executive who brings best practices to every endeavor in which he is engaged.

205.    Defendants made a false implication of fact; to wit, that SIMMONS was the cause of the unlawful activity condemned by the CFPB Consent Order and press release.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

206.     The assertion of an objective fact: that SIMMONS was responsible for WESTLAKE's illegal conduct, is precisely the type of assertion that Courts have held to be actionable false light.

207.     The false impression that SIMMONS, a highly-experienced financial professional and executive, was responsible for reckless conduct at WESTLAKE is highly offensive to a reasonable person.

208.     The false impression created by the termination of SIMMONS on the day of the CFPB press release is neither true, nor rhetorical hyperbole, nor imaginative expression.

209.     Defendants scrubbed SIMMONS' presence from the HANKEY GROUP website during a time of high traffic generated by the CFPB press release, leading to a false implication: that the illegal conduct described in the CFPB press release was SIMMONS' doing, and that he was terminated for it.

210.     The stain on SIMMONS' professional reputation is egregious, and despite his efforts to recover professionally, his reputation and economic earning capacity will likely never fully recover.

211.     At all relevant times, Defendants, and each of them, and their agents, and/or officers, engaged in and/or ratified by their actions and/or inaction through their employees and/or supervisors, the false representations of existing material facts.

212.     Defendants' acts alleged herein are malicious, oppressive, despicable, and/or in reckless disregard of Plaintiff's rights.  As such, punitive and exemplary damages are warranted against Defendants in order to punish and make an example of their actions.

213.     As a proximate result of Defendant's wrongful acts, Plaintiff has suffered and continues to suffer substantial losses incurred in seeking substitute employment and in earnings, bonuses, deferred compensation, stock options, seniority, and other employment benefits; and has

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

suffered and continues to suffer emotional distress in an amount according to proof at the time of trial.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

## ELEVENTH CLAIM
## PROMISSORY FRAUD
### (Alleged by Plaintiff against all Defendants)

214.    As an eleventh separate and distinct claim, Plaintiff complains of Defendants and DOES 1-50, inclusive, and each of them, jointly and severally, and for a claim, alleges:

215.    The factual allegations of paragraphs 1 through 211 above, are re-alleged and incorporated herein by reference.

216.    HANKEY, individually and on behalf of the HANKEY GROUP, made false promises to SIMMONS designed to induce him to detrimentally alter his position and enter into contract with HANKEY and the HANKEY GROUP.

217.    Specifically, SIMMONS and his family enjoyed a comfortable life in Salt Lake City, Utah, where they enjoyed well-paying jobs with security, and a system of care for their special-needs son.

218.    SIMMONS only agreed to uproot his family to Los Angeles and enter into contract with the HANKEY GROUP because HANKEY promised and represented that Plaintiff's employment with the HANKEY GROUP would only be terminated for cause and would be "long term in nature."

219.    HANKEY, individually and on behalf of the HANKEY GROUP, made misrepresentations with knowledge of their falsity in that he never had any intent to honor his statements that SIMMONS would only be fired for cause.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

220.    SIMMONS reasonably relied upon HANKEY's oral statements concerning his job security.  The totality of the circumstances reveals a protracted vetting process, from both sides, wherein reliance upon HANKEY's statements was reasonable.

221.    SIMMONS has suffered resulting damage.  As a proximate result of Defendants' wrongful acts, Plaintiff has suffered and continues to suffer substantial losses incurred in seeking substitute employment and in earnings, bonuses, deferred compensation, stock options, seniority, and other employment benefits; and has suffered and continues to suffer emotional distress in an amount according to proof at the time of trial.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

**TWELFTH CLAIM**
**FRAUD BY INTENTIONAL MISREPRESENTATION**
(Alleged by Plaintiff against all Defendants)

222.    As a twelfth separate and distinct claim, Plaintiff complains of Defendants and DOES 1-50, inclusive, and each of them, jointly and severally, and for a claim, alleges:

223.    The factual allegations of paragraphs 1 through 219 above are re-alleged and incorporated herein by reference.

224.    During the pre-employment vetting process and negotiation, HANKEY, individually and on behalf of the HANKEY GROUP, represented to SIMMONS the financial health and profitability of the HANKEY GROUP companies.

225.    The representations by HANKEY, individually and on behalf of the HANKEY GROUP, were false because HANKEY concealed, withheld, and had knowledge of the governmental investigations of companies under the HANKEY GROUP umbrella, problematic reserve accounting at KNIGHT, and commercial real estate accounting practices that may violate tax accounting rules.

45

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

226.    HANKEY knew that each of the representations were false when he made it, or, in the alternative, he made each representation recklessly and without regard for its truth.

227.    HANKEY intended that SIMMONS rely on the representations so that he would relocate his family and enter into contract with the HANKEY GROUP.

228.    SIMMONS acted reasonably when he relied upon the representations of HANKEY under the totality of the circumstances.

229.    As a proximate result of Defendants' wrongful acts, Plaintiff has suffered and continues to suffer substantial losses incurred in seeking substitute employment and in earnings, bonuses, deferred compensation, stock options, seniority, and other employment benefits; and has suffered and continues to suffer emotional distress in an amount according to proof at the time of trial.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

1.    For an injunction prohibiting Defendants from retaliating against its employees who participate in investigations of unlawful conduct, misleading employees concerning loan terms, amounts, and repayment schedules, and enforcing prompt payment of wages.

2.    For damages based upon promissory estoppel, consistent with the obligation assumed but not performed;

3.    For economic damages in amounts according to proof and in no event in an amount less than the jurisdictional limit of this Court;

4.    For non-economic damages in amounts according to proof;

5.    For civil penalties as provided by law and in amounts according to proof;

6.    For punitive damages in amounts according to proof;

46

7.   For attorneys' fees as provided by law;

8.   For interest as provided by law;

9.   For costs of suit herein; and

10.  For such other and further relief as the Court deems fair and just.


Dated: August 16, 2016                    SMITH PATTEN


                                          _/s/ Dow W. Patten_____
                                          DOW W. PATTEN
                                          Attorney for Plaintiff
                                          W. PAUL SIMMONS

## JURY DEMAND

Plaintiff hereby demands trial by jury of all matters so triable.


Dated: August 16, 2016                    SMITH PATTEN


                                          _/s/ Dow W. Patten_____
                                          DOW W. PATTEN
                                          Attorney for Plaintiff
                                          W. PAUL SIMMONS

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF